In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1518

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GENE B. VAUGHN,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 CR 278—**J.P. Stadtmueller**, *Judge*.

———————

ARGUED NOVEMBER 10, 2005—DECIDED JANUARY 6, 2006

———————

Before FLAUM, *Chief Judge*, and RIPPLE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. On September 17, 2004, Gene Vaughn pleaded guilty to two counts of conspiracy, stemming from the theft, transportation and fraudulent endorsement of United States Treasury checks. *See* 18 U.S.C. §§ 371, 1956(h). The District Court for the Northern District of Illinois sentenced Mr. Vaughn to 121 months' imprisonment, as well as imposed a restitution obligation in the amount of $383,919.49. Mr. Vaughn now challenges his sentence; he submits that the district court erred in consulting the 2001 Sentencing Guidelines be-

cause a majority of his conspiratorial conduct occurred prior to the enactment of those Guidelines. He also contends that the district court erred in applying the sentencing factors specified in 18 U.S.C. § 3553(a). For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

In early 2001, Mr. Vaughn entered into a conspiracy with a number of individuals to steal treasury checks, namely tax refund checks issued by the Internal Revenue Service and monthly checks issued by the Social Security Administration, from a postal distribution center in Los Angeles, California. These checks were stolen by Jonathan Culbert, Jr. and others between March 2001 and July 2002; Jonathan and Sheryl Culbert then mailed the checks to Marlon Holt in Florida, who mailed them to Mr. Vaughn in Wisconsin. R.159 at 3. It was agreed that Mr. Vaughn would open "nominee" accounts in the name of fictitious business entities for the purpose of depositing and transferring the funds to himself and his co-conspirators. *Id.*

Mr. Vaughn opened three bank accounts for this purpose. On March 23, 2001, he and Demetrious Garner opened a business checking account at Wells Fargo Bank in the name of fictitious entity, "EZ Check Cashing."[1] *Id.* Mr. Vaughn and Garner then fraudulently endorsed and

---

[1] In addition, in March 2001, Mr. Vaughn and a co-conspirator, using aliases, incorporated "EZ Check Cashing, Inc." in the state of Nevada.

deposited $388,378.26 in stolen treasury checks into this account. These funds were later withdrawn by Mr. Vaughn and transferred elsewhere. For example, during 2001, Mr. Vaughn wrote a series of checks—totaling $222,311—from the EZ Check Cashing account to a personal account at Charter One Bank, which had been opened under the alias, "Barry Vaughn." *Id.* at 5. Mr. Vaughn then used these funds for personal expenditures, including the purchase of a car. He also wrote checks, totaling $119,000, from the EZ Check Cashing account to several of his co-conspirators. The account was later closed by Wells Fargo due to suspicious activity. *Id.*

In March 2002, Mr. Vaughn, along with his niece, Tominka Vaughn, opened a second account at Wells Fargo, this time under the name of fictitious entity, "Ruekia Redd d/b/a Tax Returns by Redd." *Id.* They fraudulently endorsed and deposited $16,023.47 in stolen treasury checks into and made numerous cash withdrawals from the account. This account also was closed by the bank because of suspicious activity. *Id.*

Mr. Vaughn opened a third account in June 2002, this time at Bank One and in the name of fictitious entity, "Troy Phillips d/b/a Phillips Tax Agency." *Id.* at 4. Mr. Vaughn, along with his co-conspirators, fraudulently endorsed and deposited into this account eleven stolen checks, totaling $24,773.64. Mr. Vaughn also wrote checks from this account to the Barry Vaughn account at Charter One Bank. *Id.*

The checks fraudulently endorsed and deposited into these three accounts from March 2001 to July 2002 totaled $429,175.37; this sum included approximately $424,632.51 in stolen treasury checks and $4,542.86 in the form of a stolen non-treasury check. *Id.*

In May 2002, the United States Secret Service ("USSS")
and the FBI began investigating the criminal activities of Mr.
Vaughn and his co-conspirators. They obtained signature
cards, deposit items and endorsed checks from Wells Fargo.
On May 15, 2002, they interviewed Garner, who revealed
various details of the conspiracy and implicated Mr.
Vaughn. Tominka Vaughn was arrested on May 20, 2002,
for attempting to pass a stolen check at Wells Fargo Bank;
when interviewed, she also implicated Mr. Vaughn in the
conspiracy. Four days later, the USSS obtained and executed
a seizure warrant for Mr. Vaughn's vehicle, which had been
purchased with the stolen funds; in the vehicle, they found
a bank card for the Charter One account, and receipts for
packages sent by Mr. Vaughn to his co-conspirators in Los
Angeles. R.73, Ex.B.

## B.  District Court Proceedings

On December 9, 2003, a federal grand jury in the
Eastern District of Wisconsin returned a thirteen-count
indictment, charging Mr. Vaughn and five other defendants[2]
with violations of 18 U.S.C. §§ 371, 510(a)(2), 1344, 1956(a)(1)
(A)(I), 1956(a)(1)(B)(I) and 1956(h), and 31 U.S.C.
§§ 5324(a)(3) and 5324(d)(2).[3] Mr. Vaughn pleaded guilty to
two counts: (1) conspiracy to defraud the United States,

---

[2] Jonathan Culbert, Jr., Sheryl Culbert, Demetrious Garner,
Alvyna Sanders and Tominka Vaughn.

[3]  A superseding indictment was filed on March 23, 2004, R.88; a
second superseding indictment was filed on August 25, 2004,
anticipating *United States v. Booker*, 543 U.S. 220 (2005), and
amending the indictment to allege with specificity all possible
sentencing enhancements. R.162.

including conspiracy to steal, transport, receive and forge endorsements on treasury checks, *see* 18 U.S.C. § 371; and (2) conspiracy to commit money laundering, *see* 18 U.S.C. § 1956(h).

Prior to the sentencing hearing, Mr. Vaughn filed a motion for a downward departure. Specifically, he contended that because most of the criminal conduct at issue took place before November 1, 2001—the date that the 2001 amendments to the Sentencing Guidelines became effective—application of the 2001 Guidelines would "retroactively increas[e] [Mr. Vaughn's] punishment." R.176 at 4. Mr. Vaughn contended that, if the court nevertheless chose to apply the 2001 Guidelines, it must "enter a downward departure" to take into account the fact that his criminal conduct "straddle[d] multiple years." *Id.* at 2-3. Specifically, the defense requested a five to seven point adjustment, resulting in a sentencing range of 57-71 months. *See* Sent. Tr. Vol.II at 21.

The district court denied this motion. *Id.* at 24-25. It held that, under *United States v. Parolin,* 239 F.3d 922 (7th Cir. 2001), "trial judges [are] to apply the amended form of the guidelines even though the conduct may overlap two different sets of guidelines." *Id.* at 21. Although in this case, the court wrote, many of the acts in furtherance of the conspiracy took place before November 2001, including the theft, transportation and fraudulent endorsement of the majority of the treasury checks, "it is equally clear there were still many activities . . . that bring the totality of Mr. Vaughn's conduct within the ambit of the November 1st, 2001 sentencing guidelines." *Id.* at 24. The district court further noted that

> the facts of this case are a little more involved and sophisticated than simply suggesting that . . . these

treasury checks were for the most part converted
prior to November 1st of 2001[;] there remained an
awful lot of activities associated with the disbursement
and cleansing of those funds that occurred after Novem-
ber 1st of 2001.

*Id.* at 25. "And if there be any amelioration or suggestion of
providing some consideration for the large amount of
money that was converted prior to November 1st," the court
concluded, "I believe quite candidly that that matter can be
appropriately addressed first within the guideline construct
itself, as well as the matter of concurrent versus consecutive
sentences."[4] *Id.*

Mr. Vaughn also submitted that the district court should
consider the benefits of a sentence that would run concur-
rent with his current state sentence. R.175 at 1; R.176 at 1-2.
In part, according to the defense, a concurrent sentence
would facilitate the prompt repayment of Mr. Vaughn's
restitution obligation. *Id.* at 2; Sent. Tr. Vol.II at 10 (arguing
that, after Mr. Vaughn "serves the state sentence" and then
"the federal sentence," "it would be about a dozen years
or more before he would have the opportunity to signifi-
cantly contribute to the restitution").

The district court adopted this recommendation. It be-
gan by noting that Mr. Vaughn had a substantial criminal
history and that he had "gone undeterred" by his previous
sentences, and therefore, a lengthy term of imprisonment

---

[4] The district court also noted that, if it were to apply the 2000
Guidelines, it would need to "depart upwardly" to take into
account Mr. Vaughn's criminal history, the seriousness of his
offenses and the desirability of a prison sentence that would deter
him from future criminal conduct. Sent. Tr. Vol.II at 43.

was justified. *Id.* at 42. After giving "due recognition" to the factors listed in 18 U.S.C. § 3553(a), *id.* at 42, the district court calculated the advisory sentence range as follows: Using the 2001 Guidelines, and taking into account a two-point upward enhancement for sophisticated laundering,[5] *see* U.S.S.G. § 2S1.1(b)(3), a four-point upward enhancement for his supervisory role in the offense, *see id.* § 3B1.1(a), and a two-point downward departure for acceptance of responsibility, *see id.* § 3E1.1(a), Mr. Vaughn was assigned an adjusted offense level of 29. His previous record placed him in criminal history category II. Therefore, the 2001 Guidelines yield sentences of 60 months' imprisonment for Count I and between 97 and 121 months' imprisonment for Count II. The district court decided to follow the Guidelines on Count I, and sentenced Mr. Vaughn to 112 months' imprisonment on Count II. The district court ordered that these sentences run concurrently. It also directed that 24 months of the 112-month sentence run concurrently with three concurrent seven-year sentences for forgery imposed by the Milwaukee County Circuit Court in Wisconsin, which Mr. Vaughn was currently serving. Although the court did not specifically cite as a benefit of concurrent sentences the prompt payment of restitution, it concluded that "interests of justice" compelled this result. Sent. Tr. Vol.II at 46 (citing its authority under 18 U.S.C. § 3584(a)).

In addition to imprisonment, the district court imposed a total restitution obligation of $383,919.49, an amount equal to the total loss suffered by the relevant

---

[5] Although the defendant objected to the imposition of an enhancement for sophisticated laundering at the sentencing hearing, *see* Sent. Tr. Vol.II at 9, the district court's decision on this matter has not been challenged on appeal.

financial institutions less the amount that the government recovered from the EZ Check Cashing account. This restitution obligation was imposed jointly and severally on Mr. Vaughn and his co-defendants.[6]

## II

## ANALYSIS

### A.  Applicable Version of the Sentencing Guidelines

This court previously has determined that, when a defendant is convicted of an offense that commenced before but continued after the enactment of an amendment to the Sentencing Guidelines, he shall be subject to the amended version of the Guidelines at sentencing.[7] *See United States v.*

---

[6]  The restitution obligation breaks down as follows: $227,531.74 to Wells Fargo Bank; $137,194.05 to the United States Treasury; $14,640.77 to Bank One; and $4,552.86 to the United Wisconsin Group.

[7]  This same rule is recognized explicitly by most of our sister circuits. *See, e.g., United States v. Sullivan*, 255 F.3d 1256, 1262-63 (10th Cir. 2001) (holding that, when criminal conduct commencing before and continuing after the effective date of an amendment to the Guidelines constitutes the "same course of conduct," analogous to a conspiracy, sentencing under the new Guidelines is proper); *United States v. Hebeka*, 89 F.3d 279, 285 (6th Cir. 1996) (applying new Guidelines where a single offense lasted for multiple years and thus constituted a "continuing offense"); *United States v. Castaneda-Cantu*, 20 F.3d 1325, 1336 (5th Cir. 1994) (applying this rule to the grouping together of multiple counts, even when the defendant was charged with at least one count prior to the enactment of the guideline amendments); *United States v. Eisen*, 974 F.2d 246, 268 (2d Cir. 1992) (holding

(continued...)

*Parolin*, 239 F.3d 922, 926 n.2 (7th Cir. 2001) (upholding the district court's application of the amended Guidelines, given that the defendant "engaged in conduct subsequent to the effective date of the 1995 amendments").[8] This rule holds particular force in a conspiracy case, where, as we noted in *United States v. Couch*, the crime typically is "not a singular, discrete offense that occurs at a point in time and fades into the past" but rather represents an "ongoing course of criminal conduct." 28 F.3d 711, 714 (7th Cir. 1994). A defendant convicted of conspiracy may be sentenced under a version of the Guidelines enacted at any time prior to his withdrawal from the conspiracy—even if he took part in no overt acts in furtherance of the conspiracy post-enactment. "Withdrawal requires an affirmative act to either defeat or disavow the purposes of the conspiracy, such as making a

---

[7] (...continued)

that when a crime "straddle[s] the effective date of the Guidelines," the defendant is subject to the more current version of those Guidelines); *United States v. Thomas*, 895 F.2d 51, 57 (1st Cir. 1990) (holding that, because the "conspiracy at issue continued past the effective date of the [amended version of the] Sentencing Guidelines," those amendments governed the calculation of the defendant's sentence); *United States v. Rosa*, 891 F.2d 1063, 1069 (3d Cir. 1989) (same); *United States v. Tharp*, 892 F.2d 691, 693-95 (8th Cir. 1989) (surveying the legislative history of the 1987 amendments to the Sentencing Guidelines and concluding that the "legislative intent favors application of the [new] Guidelines to continuing offenses like the conspiracy before us").

[8] Although *Parolin* was decided pre-*Booker*, this fact does not affect the validity of its rule. *Booker* made the Guidelines advisory; it did not, however, change the method by which a guidelines sentence is calculated for purposes of determining the advisory sentencing range.

full confession to the authorities or communicating to co-conspirators that one has abandoned the enterprise." *See United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir. 2000) (holding that, because the defendant did not "affirmatively disavow[] the purposes of the conspiracy" before the guideline amendments became effective, he was subject to those Guidelines at sentencing) (emphasis removed).[9]

We therefore turn to consider the district court's factual finding that Mr. Vaughn did not withdraw from the conspiracy prior to November 1, 2001—a finding that we review deferentially and shall overturn only if clearly erroneous. *See United States v. Julian*, 427 F.3d 471, 489 (7th Cir. 2005). There is ample evidence supporting the district

---

[9] For other circuits adopting this rule, see *United States v. Graham*, 275 F.3d 490, 516 n.16 (6th Cir. 2001) ("Because the crimes continued after the effective date of the amendment, the application of the adjustment does not present retroactivity problems."); *United States v. Maggard*, 156 F.3d 843, 851 (8th Cir. 1998) (holding that, because conspiracy is a continuing offense, application of the Sentencing Guidelines in effect at the time of withdrawal or sentencing is proper); *United States v. Lightbourn*, 115 F.3d 291, 293-94 (5th Cir. 1997) (holding that, because the conspiracy continued into the time period governed by the new Guidelines, their application did not violate the Ex Post Facto Clause); *United States v. Innamorati*, 996 F.2d 456, 489 (1st Cir. 1993) (applying new Guidelines because the defendant did not withdraw from the conspiracy before they became effective); *United States v. Bennett*, 984 F.2d 597, 609-10 (4th Cir. 1993) (same); *United States v. Williams*, 897 F.2d 1034, 1040 (10th Cir. 1990) (same); *Rosa*, 891 F.2d at 1069 (holding that, although the defendant did nothing to "further the conspiracy" post-enactment, he did not "affirmatively renounce[] the conspiracy," rendering application of the new Guidelines proper).

court's conclusion that Mr. Vaughn's criminal conduct, including his participation in the conspiracy, continued well past the effective date of the 2001 Guidelines. As Mr. Vaughn points out, by November 1, 2001, many goals of the conspiracy already had been accomplished. For example, Mr. Vaughn had: (1) accepted the transmittal of most of the stolen checks from his co-conspirators in California; (2) opened the first account at Wells Fargo; (3) deposited into that account the vast majority of the stolen funds, totaling $388,378.26; and (4) recruited various accomplices. Nevertheless, he remained a member of the conspiracy and acted to further this conspiracy after the effective date of the 2001 Guidelines, as well. In 2002, he recruited another accomplice, his niece Tominka Vaughn. He continued to receive treasury checks through July 2002 from his co-conspirators. He opened the second checking account at Wells Fargo under a fictitious name in March 2002, into which he deposited $16,023.47 in stolen money. He opened a third account in June 2002, this time at Bank One, under a fictitious name; and he fraudulently endorsed and deposited $24,773.64 in stolen treasury checks into that account. In light of the plethora of evidence demonstrating that Mr. Vaughn's criminal conduct straddled two versions of the Sentencing Guidelines, and the general practice of applying the version of the Guidelines in effect at the time of sentencing, we hold that the district court did not err in calculating Mr. Vaughn's guideline range under the 2001 Guidelines.

## B. Reasonableness

Mr. Vaughn submits that, even if the district court properly calculated the advisory sentencing range, it should have departed from that range to account for: (1) the fact that more than 90% of the checks ($388,278 of $429,000)

were stolen, transported, fraudulently endorsed, deposited and laundered while the old Guidelines were still in effect; and (2) the harsh difference between the 2000 and 2001 Guidelines' sentencing recommendations for the crimes in question. The failure of the district court to consider these factors, according to Mr. Vaughn, renders his sentence unreasonable and unjust.

Before reaching the merits of Mr. Vaughn's argument, we pause to address our jurisdiction to review a district court's refusal to grant a "downward departure." The Government notes that, when the district court recognizes its authority to depart under the Guidelines but in an exercise of its discretion chooses not to do so, the general rule pre-*Booker* was that an appellate court lacks jurisdiction to review that decision. *See, e.g.*, *United States v. Fish*, 388 F.3d 284, 288-89 (7th Cir. 2004).[10] According to the Government, because there is no evidence that the district court mistakenly believed it lacked the authority to depart from the advisory sentencing range, its discretionary refusal to do so is unreviewable.

However, as we recently remarked, the concept of a discretionary departure—over which we previously had no jurisdiction—"has been rendered obsolete in the post-*Booker* world. Instead, 'what is at stake is the reasonableness of the sentence, not the correctness of the departures as measured against pre-*Booker* decisions that cabined the discretion of sentencing courts to depart from guidelines that were then mandatory.'" *United States v. Arnaout*, 2005 WL 3242213, at *7 (7th Cir. 2005) (internal cita-

---

[10] *See also United States v. Abimbola-Amoo*, 390 F.3d 937, 938-39 (7th Cir. 2004); *United States v. Johnson*, 289 F.3d 1034, 1043 (7th Cir. 2002); *United States v. Payton*, 198 F.3d 980, 984 (7th Cir. 1999).

tion omitted).[11] Post-*Booker*, because we must review all sentences for reasonableness in light of the factors specified in § 3553(a), we necessarily must scrutinize, as part of that review, the district court's refusal to depart from the advisory sentencing range.

We therefore turn to Mr. Vaughn's claim that his sentence is unreasonable. After *Booker*, although the Sentencing Guidelines are advisory, sentencing judges nevertheless are required to compute correctly the applicable sentencing range; they then may depart from this range if appropriate justification is offered for the departure. Sentences that fall within a properly computed sentencing range are entitled to a "rebuttable presumption of reasonableness." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Ultimately, "[w]hether a sentence is reasonable depends on its conformity to the sentencing factors set forth in 18 U.S.C. § 3553(a)[]." *United States v. Cunningham*, 429 F.3d 673, 675 (7th Cir. 2005). Although the district court need not "discuss every argument made by a litigant," there must be sufficient indication that it considered the § 3553 factors relevant to the calculation of the defendant's sentence and that the application of those factors to the facts of the case was not unreasonable. *Id.* at 678 (holding that the sentencing judge gave insufficient attention to the defendant's psychiatric

---

[11] *See also United States v. Long*, 425 F.3d 482, 487 (7th Cir. 2005) ("After *Booker*, all sentences, including those that are above or below the range that the guidelines would advise (*i.e.,* those that we would have described as the result of 'departures' in the pre-*Booker* world), are to be reviewed for reasonableness."). *But cf. United States v. D'Oliveira*, 402 F.3d 130, 133 (2d Cir. 2005) (holding that the jurisdictional bar on reviewing a discretionary downward departure under U.S.S.G. § 2L1.2(b)(1) survives *Booker*).

problems and substance abuse as mitigating factors in calculating the appropriate sentence, and remanding for re-sentencing).

Mr. Vaughn argues that, because his involvement in the conspiracy began when the 2000 Guidelines—which recommend almost half the sentence suggested by the 2001 Guidelines—were still in effect, the sentence imposed in this case is both unjust and unnecessary. We find no error in the district court's determination of Mr. Vaughn's sentence, despite that it is significantly longer than the range advised by the 2000 Guidelines. Mr. Vaughn's 112-month sentence falls at the midpoint of the range recommended by the 2001 Guidelines, and thus is entitled to a rebuttable presumption of reasonableness. *Mykytiuk*, 415 F.3d at 608. "It will be a rare Guidelines sentence that is unreasonable," *id.*, and Mr. Vaughn's is not one of them. As we have noted earlier, the district court's application of the 2001 Guidelines to criminal conduct occurring both pre- and post-enactment of those Guidelines enjoys the support of well-established case law.[12]

Moreover, the district court, evaluating the facts of Mr. Vaughn's case in light of the factors listed in § 3553(a), concluded that the sentencing range recommended by the 2001 Guidelines better served the goals of retribution, punishment and deterrence than did the former sentencing

---

[12] *See infra* (discussing the straddle rule); *see also United States v. Thomas*, 114 F.3d 228, 271-72 (D.C. Cir. 1997) (rejecting the argument that because the new Sentencing Guidelines impose "harsher penalties on defendants . . . than did the prior sentencing regime," it was unfair to apply those Guidelines to pre-enactment conduct—even though, standing alone, that conduct would have been punished less severely); *United States v. Terzado-Madruga*, 897 F.2d 1099, 1124 (11th Cir. 1990) (same).

regime. It held that, given Mr. Vaughn's significant involvement in the conspiracy and his lengthy criminal history, he "ha[d] not [yet] learned the lessons from the error of [his] way[s]." Sent. Tr. Vol.II at 42. Therefore, reasoned the court, the advisory range of the 2000 Guidelines "understated the seriousness of the offense." *Id.* at 43 (noting that if the 2000 Guidelines were in effect, "the court really ought to depart upwardly" in light of these factors). Because the district court's conclusions are supported by the record and "appropriately related to the factors specified in § 3553(a)," *see United States v. Johnson,* 427 F.3d 423, 429 (7th Cir. 2005), we cannot find unreasonable the court's decision not to depart from the 2001 sentencing range.

Mr. Vaughn also contends that his sentence is unreasonable because the district court failed to consider adequately "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a)(7).[13] Although the district court did not specifically cite § 3553(a)(7) during the sentencing hearing, nor explicitly reference the defense's argument concerning the desirability of facilitating the

---

[13] Mr. Vaughn also submits that the district court erred in not considering his age and character. These arguments, however, were interlinked with his § 3553(a)(7) analysis. Because of Mr. Vaughn's age, according to the defense, he will only have a limited number of productive years after he is released from prison if his 112-month sentence is upheld. Thus, he will be unable to repay the full amount of his obligation before he retires or passes away. *See, e.g.,* Appellant's Reply Br. at 7 (submitting that the sentence imposed by the district court "[is] long enough that he will not have many good working years left to repay the restitution obligation"); R.176 at 2 (contending that "Mr. Vaughn is a hard worker" and, thus, "the sooner he gets back to work place . . . the sooner the restitution will be repaid to the victims").

prompt repayment of restitution, it must be remembered that the argument was presented to the district court in a different light than it is now presented on appeal; instead of being framed as a justification for downward departure, it was framed as a motion for concurrent time. Specifically, prior to the sentencing hearing, the defense filed a motion for a concurrent term, along with a supporting memorandum; in these documents, the defense asked the district court to "consider the possibility of running the defendant's sentence concurrent to his current state sentence." R.176 at 1. If released at an earlier date, the defense noted, "Mr. Vaughn will be in a better position to pay back restitution and his debt to society." *Id.* at 2. This suggestion was repeated at the sentencing hearing. Defense counsel requested a "partially concurrent sentence, one in which perhaps a couple years or more would run concurrent with his state sentence," in order to "help facilitate early payment of restitution." Sent. Tr. Vol.II at 29.

Although not discussing at-length its decision to do so, the sentencing judge adopted this recommendation in full, noting that this result was compelled by "the interests of justice." *Id.* at 46. Specifically, the district court directed that Mr. Vaughn's sentences on Counts I and II run concurrently, and that two years of the 112-month sentence—the length of time suggested by defense counsel—run concurrently with Mr. Vaughn's three concurrent seven-year state sentences for forgery currently being served. The concurrent nature of Mr. Vaughn's sentences renders the length of imprisonment not nearly as extreme as it may seem at first glance; the district court effectively reduced the total time Mr. Vaughn will spend in prison for his federal offenses to 88 months, which is 9 months below the advisory range applicable to this case under the Guidelines. The need to provide restitution does not demand an

even lower sentence than that imposed. As the district court noted, Mr. Vaughn committed a sophisticated and calculated crime involving multiple players and large sums of money. A lengthy sentence is necessary to account for the gravity of the offense and for Mr. Vaughn's criminal history, to protect the public and to "really act[] in a meaningful way to deter future [criminal] conduct." *Id.* at 42.[14]

---

[14] Mr. Vaughn also contends that the disparity between his sentence and the sentences received by his co-conspirators demonstrates the unreasonableness of applying the 2001 Guidelines to his criminal conduct. However, because this claim was not raised in the district court, it is deemed forfeited. Moreover, the district court's failure to consider his co-conspirators' sentences does not constitute plain error. Mr. Vaughn admits that his co-conspirators "ceased their conduct a few months prior to Mr. Vaughn," and thus are not subject to the 2001 Guidelines. Appellant's Br. at 13. *Cf. United States v. White*, 406 F.3d 827, 837 (7th Cir. 2005) ("[W]e have repeatedly stated that a disparity among co-defendants' sentences is not a valid basis to challenge a guideline sentence otherwise correctly calculated."). Mr. Vaughn's sentence was correctly calculated and properly falls within the Guidelines' range of 97-121 months. Thus, any disparity between the sentences of Mr. Vaughn and his co-conspirators does not render Mr. Vaughn's sentence unreasonable.

**Conclusion**

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*