In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-3690, 08-4246, 08-4320,
    09-1864 & 09-2174

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL A. VALLONE, ROBERT W.
HOPPER, TIMOTHY S. DUNN, and
EDWARD BARTOLI,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 04 CR 372 — **Charles R. Norgle, Sr.**, *Judge*

ON REMAND FROM
THE SUPREME COURT OF THE UNITED STATES

SUBMITTED SEPTEMBER 6, 2013 — DECIDED MAY 16, 2014

Before ROVNER and WILLIAMS, *Circuit Judges* and YOUNG,
*District Judge.*[*]

ROVNER, *Circuit Judge*. This case returns to us on remand
from the Supreme Court of the United States. The defendants
were convicted of engaging in a sophisticated tax-fraud con-
spiracy that caused a loss of income-tax revenue to the govern-
ment exceeding $60 million. We affirmed the defendant's
convictions and sentences in *United States v. Vallone*, 698 F.3d
416 (7th Cir. 2012); and we assume the reader's familiarity with
that decision. Five of the six defendants thereafter jointly
petitioned the Supreme Court for a writ of *certiorari*, contend-
ing (among other points) that their sentences violate the *ex post
facto* clause, U.S. CONST. art. I, § 9, cl. 3, because the district
court sentenced each of them using the version of the Sentenc-
ing Guidelines in effect at the time of his sentencing rather than
the more favorable version in effect at the time of his offenses.
The Court granted the defendants' petition, vacated the
judgment, and remanded the case for reconsideration in light
of the Court's recent decision in *Peugh v. United States*, 133
S. Ct. 2072 (2013). *See Dunn v. United States*, 133 S. Ct. 2825,
*reh'g denied*, 134 S. Ct. 42 (2013). Pursuant to Circuit Rule 54,
the parties have submitted memoranda setting forth their
respective positions as to what action this court should take in
light of *Peugh*. We now conclude that no violation of the *ex post
facto* clause occurred in sentencing any of the four defendants

---

[*] The Honorable Richard L. Young, Chief Judge of the United States District
Court for the Southern District of Indiana, sitting by designation.

before us, as the relevant change in the Guidelines occurred in November 2001, and the conspiracy of which the defendants were convicted did not conclude until 2003. We therefore again affirm the sentences imposed on Vallone, Hopper, Dunn, and Bartoli[1] and reinstate our previous opinion as modified by the reasoning we set forth below.

The tax-related crimes charged in this case ended late in 2003. In sentencing the various defendants, however, the district court applied the 2007 and 2008 versions of the Guidelines in effect at the time of their sentencings. *See* 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a) & (b)(1) (court shall use Guidelines Manual in effect at time of sentencing unless doing so would violate *ex post facto* clause). Hopper argued both below and on appeal that this constituted an *ex post facto* violation, because the tax loss table used to establish his base offense level, *see* U.S.S.G. § 2T4.1, had been changed to his detriment after his active participation in the criminal activity ended.[2] Both the district court and this court rejected that argument on the strength of our decision in *United States v. Demaree*, 459 F.3d 791 (7th Cir. 2006), which reasoned that, in view of the advisory-only status of the guidelines after *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), no *ex post facto* problem was posed by applying the version of Guidelines in effect at sentencing, even if that version treated the defen-

---

[1]  Defendant Cover died on December 31, 2013.

[2]  Defendant Dowd made the same argument, but he did not seek *certiorari*.

dant's crimes more harshly than the one in effect at the time of his offense. *See Vallone*, 698 F.3d at 494–95; R. 1085 at 12–13, 17.

*Peugh* rejected our reasoning in *Demaree*. The Supreme Court emphasized that the Guidelines continue to play a significant role at sentencing notwithstanding the fact they no longer bind the judge's choice of sentence after *Booker*. The district judge must still begin by properly calculating the Guidelines range, 133 S. Ct. at 2080, and although he has the authority and discretion to impose a sentence outside that range, the advisory range, which represents the Sentencing Commission's view as to what constitutes an appropriate sentence, remains a benchmark throughout the processes of sentencing and appellate review, *id.* at 2083. Indeed, if the judge is contemplating a sentence outside of the Guidelines range, he must consider the extent of the deviation from that range and satisfy himself that there is a compelling justification for it. *Id.* These requirements mean that "[i]n the usual sentencing, … the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Id.* (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion)). Even when a judge decides to impose a non-Guidelines sentence, the Guidelines represent the basis for the sentence in the sense that the advisory range constitutes both the starting and reference points for that sentence. *Id.* (quoting *Freeman*). Similarly, a reviewing court may presume that a within-range sentence is reasonable, and when confronted with a sentence below or above the range will consider whether the extent of the variance is appropriate in comparison with the advisory range. *Id.* In short: "The federal system

adopts procedural measures intended to make the Guidelines the lodestone of sentencing. A retrospective increase in the Guidelines range applicable to a defendant [thus] creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Id.* at 2084.

Obviously our reliance on *Demaree* as the basis for rejecting the *ex post facto* argument can no longer stand; we therefore retract the relevant portions of our prior opinion, 698 F.3d at 489, 494–95, and consider anew whether in fact the defendants' *ex post facto* rights were violated by the district court's use of the 2007 and 2008 Guidelines in determining their sentences. We shall assume *arguendo* that each of the four defendants before us is entitled to advance the *ex post facto* argument, although among these four only Hopper preserved such an argument by making it to us earlier. The *certiorari* petition filed by these defendants candidly acknowledged that fact and suggested that any question of waiver could be addressed by this court on remand. *See* Petition for Writ of Certiorari, *Dunn, et al. v. United States*, 2013 WL 703419, at *9 & n.5 (Feb. 25, 2013) (No. 12-1056). We do not understand the Court's remand order to foreclose consideration of whether the defendants other than Hopper waived the *ex post facto* issue; but in view of our conclusion that their *ex post facto* rights were not violated, we need not take up that issue.

The one and only change in the Guidelines that the defendants contend affected them adversely is the revision to the tax table which establishes the base offense level for the sorts of tax evasion and tax fraud offenses of which the defendants were found guilty. *See* U.S.S.G. § 2T4.1. The change took effect with

the 2001 version of the Guidelines. Previously, the tax table would have specified a base offense level of 25 for losses approximating $60 million, which is the loss for which most of the defendants in this case were held to account. *See* § 2T4.1(T) (Nov. 2000); after the revision, the table specified a base offense level of 30. *See* § 2T4.1(M) (Nov. 2001). There is no doubt that this change was adverse to the defendants. The question, then, is whether this change can be said to have taken effect *after* the defendants' offenses were completed; only then could it be characterized as a retrospective change implicating their *ex post facto* rights. *Cf. United States v. Cruz*, 522 F. App'x 352, 353 n.1 (7th Cir. 2013) (nonprecedential decision) (although court applied November 2012 Guidelines rather than November 2009 or 2010 Guidelines in effect at time of defendant's offense, "[n]o Ex Post Facto Clause issues are present in this case, … because the relevant portions of the November 2012 Sentencing Guidelines do not provide a higher applicable sentencing range than the November 2009 and November 2010 Sentencing Guidelines").

The defendants were convicted of multiple crimes, but for present purposes the pertinent one is the offense of conspiracy, given its nature as a continuing offense. Each of the defendants was convicted on Count One of the superseding indictment, which pursuant to 18 U.S.C. § 371 charged them with conspiring to defraud the United States by interfering with the collection of income taxes by the Internal Revenue Service ("IRS") and by committing offenses against the United States through, *inter alia*, aiding and abetting the preparation and presentation of false and fraudulent income tax returns to the

IRS. The evidence revealed that the conspiracy began in 1994 and ended in 2003. Notably, that time period straddles the former and current version of the tax loss table.

In *United States v. Vaughn*, 433 F.3d 917 (7th Cir. 2006), on which the government relies, the defendant likewise had been convicted of conspiracy under section 371. As here, the conspiracy began prior to the effective date of the November 2001 version of the Guidelines but did not conclude until after that date. In view of the continuing nature of the conspiracy offense, which brought the offense within the scope of the later version of the Guidelines, we concluded that it was appropriate to sentence the defendant under that version notwithstanding that it punished him more severely than prior versions. *Id.* at 921–22. Our reasoning, because it bears directly on the arguments made here, is worth quoting at some length:

> This court previously has determined that, when a defendant is convicted of an offense that commenced before but continued after the enactment of an amendment to the Sentencing Guidelines, he shall be subject to the amended version of the Guidelines at sentencing. *See United States v. Parolin*, 239 F.3d 922, 926 n. 2 (7th Cir. 2001) (upholding the district court's application of the amended Guidelines, given that the defendant "engaged in conduct subsequent to the effective date of the 1995 amendments."). This rule holds particular force in a conspiracy case, where as we noted in *United States v. Couch*, the crime typically is "not a singular, discrete offense that

occurs at a point in time and fades into the past"
but rather represents an "ongoing course of
criminal conduct." 28 F.3d 711, 714 (7th Cir.
1994). A defendant convicted of conspiracy may
be sentenced under a version of the Guidelines
enacted at any time prior to his withdrawal from
the conspiracy—even if he took no overt acts in
furtherance of the conspiracy post-enactment.
"Withdrawal requires an affirmative act to either
defeat or disavow the purposes of the conspir-
acy, such as making a full confession to the
authorities or communicating to co-conspirators
that one has abandoned the enterprise." *See
United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir.
2000) (holding that, because the defendant did
not "affirmatively disavow[ ] the purposes of the
conspiracy" before the guideline amendments
became effective, he was subject to those Guide-
lines at sentencing) (emphasis removed).

433 F.3d at 921–22 (footnotes omitted).

*Vaughn*'s holding was not framed as one addressing *ex post
facto* concerns[3] but its rationale is nonetheless of a piece with
the cases that do deal expressly with the *ex post facto* clause. It
bears noting in this regard that prior to *Booker* (and *Demaree*),
when the Guidelines were mandatory, we did recognize that

---

[3]  Our decision mentioned the *ex post facto* clause only once, in a parentheti-
cal within a footnote collecting cases from other circuits. *See* 433 F.3d at 922
n.9 (citing *United States v. Lightbourn*, 115 F.3d 291, 923–94 (5th Cir. 1997)).

the retroactive application of a more punitive version of the
Guidelines to an offense predating that version was contrary
to the *ex post facto* clause. *See United States v. Seacott*, 15 F.3d
1380, 1383–86 (7th Cir. 1994); *United States v. Kopshever*, 6 F.3d
1218, 1222–23 (7th Cir. 1993), *abrogated on other grounds by
United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012). Even so,
we repeatedly held that when a defendant was engaged in a
continuing crime like conspiracy, or multiple offenses compris-
ing a single course of closely related conduct, and he did not
terminate that conduct until after the effective date of a new,
more punitive guideline, it was both appropriate and consis-
tent with the *ex post facto* clause to apply the revised guideline.
*See*, *e.g.*, *United States v. Vivit*, 214 F.3d 908, 917–19 (7th Cir.
2000); *United States v. Hall*, 212 F.3d 1016, 1023–24 (7th Cir.
2000); *United States v. Boyd*, 208 F.3d 638, 648 (7th Cir. 2000),
*cert. granted in part & judgment vacated on other grounds*, 531 U.S.
1135, 121 S. Ct. 1072 (2001); *United States v. Jackson*, 983 F.2d
757, 771 (7th Cir. 1993). As the Supreme Court has explained,
"Critical to relief under the *Ex Post Facto* Clause is not an
individual's right to less punishment, but the lack of fair notice
and governmental restraint when the legislature increases
punishment beyond what was prescribed when the crime was
consummated." *Weaver v. Graham*, 450 U.S. 24, 30, 101 S. Ct.
960, 965 (1981); *see also Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.
Ct. 891, 895–96 (1997); *Miller v. Florida*, 482 U.S. 423, 430, 107 S.
Ct. 2446, 2451 (1987). We reasoned that when a defendant
continues with an ongoing crime or course of criminal conduct
past the effective date of a revised guideline, such that his
conduct straddles the original and amended versions of that

guideline, he is on notice that his conduct will be subject to the
new provision. The choice is his whether to cease or persist;
and if he chooses to keep going down the wrong path, the
application of the new guideline and a harsher penalty cannot
be said to have taken him by surprise. *Boyd*, 208 F.3d at 648–49;
*Jackson*, 983 F.2d at 771. Notably, as the passage from *Vaughn*
quoted above acknowledges, our cases have treated a defen-
dant's failure to withdraw from an ongoing conspiracy as the
equivalent of active involvement in the conspiracy for this
purpose; thus, even if the defendant took no overt acts in
furtherance of the conspiracy after the effective date of the
Guidelines provision in question, so long as he did not
withdraw from the conspiracy, we have deemed it appropriate
to apply the new provision to him. 433 F.3d at 922; *see also Hall*,
212 F.3d at 1023–24; *Boyd*, 208 F.3d at 648.

Since *Peugh* was decided, we have returned to our former
*ex post facto* sentencing jurisprudence. *See*, *e.g.*, *United States v.
Woodard*, 744 F.3d 488, 497 (7th Cir. 2014). As before *Demaree*,
we will sustain the application of a new, more punitive version
of the Guidelines to the defendant's offense conduct so long as
that conduct straddled the effective date of the new version.
*See United States v. Hallahan*, 744 F.3d 497, 513–14 (7th Cir.
2014). Given that the defendants in this case were convicted of
the continuing offense of conspiracy, then, the relevant inquiry
for purposes of their *ex post facto* claim is whether that conspir-
acy continued past the effective date of the amended (and
more punitive) version of the tax table.

None of the defendants disputes that the conspiracy
continued beyond November 1, 2001; but three of them

(Hopper, Dunn, and Bartoli) argue that because they were no longer involved in the conspiracy as of that date, the *ex post facto* clause precludes application of the revised tax table to them. But as *Vaughn* and many other decisions make clear, simply because the defendants may no longer have been active participants in the conspiracy does not mean that they had withdrawn from the conspiracy and could not be held culpable for what occurred after that point. 433 F.3d at 922. "As we have pointed out before, '[i]t is not … all that easy to withdraw from a conspiracy,' and it is the defendant's burden [at sentencing] to show that he did." *United States v. Julian*, 427 F.3d 471, 473 (7th Cir. 2005) (quoting *Hall*, 212 F.3d at 1023). "Simply ceasing to participate even for extended periods of time is not sufficient to show withdrawal." *Id.* Instead, withdrawal requires affirmative action on the defendant's part to defeat or disavow the unlawful goal of the conspiracy. *Id.* None of the defendants cites any evidence that would be sufficient to support a finding that he withdrew from the conspiracy, in the sense that our cases require, prior to November 1, 2001. Indeed, each of these three defendants has previously made an argument materially identical to the one he is making now (Hopper and Dunn in challenging the relevant loss amount for sentencing purposes, and Bartoli in making a statute of limitations argument), and we rejected all of those arguments in our prior decision. 698 F.3d at 493–94 (Hopper); *id.* at 500–01 (Dunn); *id.* at 511–13 (Bartoli). Despite their contention that a fresh exploration of this question is in order, the defendants identify nothing that they have not already argued and that we have not already considered on this subject. As we have noted, the failure to

withdraw from a conspiracy that continues beyond the effective date of a new guideline renders the defendant subject to that guideline even if he terminated his active involvement before the revised guideline took effect. *See Hall*, 212 F.3d at 1023–24; *Boyd*, 208 F.3d at 648.

This leaves defendants with a secondary argument that because the vast majority (between 98 and 99 percent) of the $60-plus million tax loss in this case was incurred before the revised tax table took effect, the *ex post facto* clause should foreclose application of the revised table regardless of the later end date of the conspiracy. The argument has the greatest force in Hopper's case, as the government conceded at his sentencing that he should be held to account for a lesser loss amount of $56 million, 100 percent of which was incurred prior to 2001. R. 1085 at 17–18.

Whatever its superficial appeal, the argument fails. As we have been emphasizing, the conspiracy continued well past the November 1, 2001 effective date of the new table. That the conspiracy may have resulted in relatively few documented losses beyond that date does not nullify the fact that the crime was ongoing. Proof of actual pecuniary loss has never been necessary to the charge of conspiracy, including a section 371 conspiracy. *See Dennis v. United States*, 384 U.S. 855, 860, 86 S. Ct. 1840, 1844 (1966) ("the alleged concert of action—the common decision and common activity for a common purpose[—] … lay at the core of the alleged [section 371] offense"); *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 512 (1924) ("It is not necessary that the government shall be subjected to property or pecuniary loss by the

fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the over-reaching of those charged with carrying out the governmental intention."); *Haas v. Henkel*, 216 U.S. 462, 479, 30 S. Ct. 249, 253–54 (1910); *United States v. D'Andrea*, 585 F.2d 1351, 1354 (7th Cir. 1978), *overruled on other grounds by United States v. Read*, 658 F.2d 1225, 1236 & n. 7 (7th Cir. 1981); *see also, e.g., United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989); *United States v. Puerto*, 730 F.2d 627, 630–31 (11th Cir. 1984); *United States v. Pintar*, 630 F.2d 1270, 1277–78 (8th Cir. 1980); *United States v. Burgin*, 621 F.2d 1352, 1357–58 (5th Cir. 1980). The essence of conspiracy, after all, is the agreement to commit an unlawful act; it is therefore not necessary to show that the conspiracy succeeded in its illicit aim. *E.g., United States v. Jiminez Recio*, 537 U.S. 270, 274–75, 123 S. Ct. 819, 822 (2003). So the fact that the losses were tapering off does not exempt the defendants from the rule that continuation of the crime will subject them to a revision in the Guidelines that takes effect during the life of the conspiracy. This was true in *Vaughn*, for example, where more than 90 percent of the U.S. Treasury checks that were the object of the charged conspiracy had already been stolen, fraudulently endorsed, deposited, and laundered by the time the new loss table took effect. *See* 433 F.3d at 923.

Indeed, we have sustained the application of a revised guideline on this basis even when the particular conduct triggering the guideline was complete before the guideline took effect. Our decision in *Vivit* is a prime example.

In that case, we upheld the application of a guideline specifying a two-level increase in the defendant's offense level for the use of a minor to commit the offense, *see* U.S.S.G. § 3B1.4, notwithstanding the fact that the minors in question all had been employed in the scheme prior to the effective date of that particular provision. 214 F.3d at 916–19. The defendant in *Vivit* was a physician who had been convicted of 16 counts of mail fraud based on his submission of reimbursement claims to insurance companies that significantly over-represented the nature and degree of care he had provided to the patients in question; some of the patients involved in the scheme to defraud were minors. The fraudulent scheme began in 1993 and ended in 1996. It was while the scheme was ongoing that the Guidelines were amended in November 1995 to provide for the offense-level increase to reflect the use of minors. Vivit contended that the application of that new provision to him violated the *ex post facto* clause, given that all of the fraudulent mailings involving minors were complete before that provision of the Guidelines took effect.

We began our analysis by noting the significance of the "one-book rule," which requires that the Guidelines be applied as "a cohesive whole" and not "in a piecemeal fashion." *Id.* at 917 (citing U.S.S.G. § 1B1.11(b)(1) and *United States v. Boula*, 997 F.2d 263, 266 (7th Cir. 1993)). In other words, where a defendant's criminal conduct spans multiple versions of the Guidelines, a court will not pick and choose among the various provisions of those versions depending on the date of the particular conduct in question; it will apply one version to the entirety of the defendant's conduct. *See id.*; § 1B1.11(b)(2) ("The

Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual. …"). Which version the court shall use will depend on the *ex post facto* clause: the version in effect at the time of the defendant's sentencing will be used unless that version treats him more harshly than the version in effect at the time of his crime, in which case the latter version will be used. *See* § 1B1.11(a) & (b)(1). Either way, one edition of the Guidelines will govern all aspects of his sentence. § 1B1.11(b)(2); *Vivit*, 214 F.3d at 917. So the merit of Vivit's *ex post facto* claim depended not on when the specific acts involving minors took place, but rather on when his mail fraud "offense" could be said to have occurred, for purposes of selecting the relevant version of the Guidelines. *See* § 1B1.11(a) & (b)(1).

Although mail fraud, in contrast to conspiracy, is not a continuing offense, we concluded that because Vivit's multiple mail fraud convictions were to be grouped together under the section 3D1.2 of the Guidelines (as they involved substantially the same harm), it was appropriate to treat those convictions collectively as the equivalent of a continuing offense or a single course of criminal conduct that straddled the revision in the Guidelines. 214 F.3d at 918–19. The last act of mail fraud for which Vivit had been convicted occurred in August 1996, after the effective date of the November 1995 Guidelines incorporating the new use-of-a-minor provision. Consequently, it was appropriate to sentence Vivit using the 1995 Guidelines, as the

Guidelines themselves instructed. *Id.*; *see* § 1B1.11(b)(3) (where defendant has been convicted of two offenses, one of which was committed before the effective date of a revised version of the Guidelines and the other after, the revised Guidelines shall be applied to both offenses). This did not violate the *ex post facto* clause, we reasoned, because Vivit was on notice by virtue of the longstanding grouping rules of the Guidelines that his offenses would be grouped for sentencing and that, consequently, if he committed a mail fraud offense after the revised version of the Guidelines took effect that was closely related to his earlier mail fraud offenses, he would be sentenced under the revised version. *Id.* at 919; *see also Hallahan*, 744 F.3d at 513–14; *United States v. Pagán-Ferrer*, 736 F.3d 573, 598–99 (1st Cir. 2013), *petition for cert. filed* (U.S. Feb. 14, 2014) (No. 13-8744).

Our decision in *Boyd* is a second example. *Boyd* was a conspiracy case arising out of the criminal activities of Chicago's El Rukn street gang. Because the charged conspiracy had ended after the Guidelines first took effect in November 1987, we held that the defendants' *ex post facto* rights were not violated when the district court sentenced them using the Guidelines. 208 F.3d at 648. One defendant, Green, additionally argued that it was an *ex post facto* error to enhance his offense level pursuant to section 3B1.1(a) for having been a leader of the conspiracy, in view of his demotion from El Rukn "general" to "private" before the Guidelines took effect. We rejected that argument too; all that mattered, in our view, was that the conspiracy (from which Green had not withdrawn) continued past the date on which the Guidelines took effect:

> The conspiracy of which [Green] was a member straddled the date of promulgation, and a crime that straddles can be punished under a guideline promulgated after the straddle date. The straddle rule implies punishment for conduct committed before the date of the guideline that determined the severity of the punishment, and we cannot see what difference it can make whether the pre-guideline conduct was the sale of a quantity of drugs perhaps much greater than any that occurred after the critical date or the exercise of leadership responsibilities relinquished by that date.

*Id.* (citations omitted)

These cases make clear that it is immaterial how much, if any, of the pecuniary loss in this case occurred relative to the effective date of the revised tax table. What is material is the end date of the conspiracy. As the conspiracy continued past the effective date of the November 2001 Guidelines which contained the new tax table, and none of the defendants had withdrawn from the conspiracy prior to that date, it was appropriate to apply the 2001 Guidelines, including the revised tax table, to the loss.

This is not to say that the defendants would have no basis to argue that the application of the 2001 tax table had a distorting effect on their advisory sentencing ranges, given that so much of the loss (or in Hopper's case, all of it) had occurred before the more punitive version of the table became effective.

This is an argument as to the substantive reasonableness of the advisory range and the sentence that the court ought to have imposed. But it was an argument that was available to the defendants at the time they were sentenced—indeed, the entire premise of *Demaree* was that after *Booker*, the sentencing judge has wide discretion to entertain these very sorts of arguments. Nothing about *Peugh* has altered the nature or basis of that argument. As we have seen, regardless of whether *Demaree* or a pre-*Booker* case like *Vaughn* was the controlling precedent, the defendants were appropriately sentenced using the revised tax table that took effect in November 2001; the effect of the tax table on the defendants' sentences was always self-evident, and because the defendants were sentenced after *Booker*, they were free to argue that a sentence within the advisory range produced, in part, by the revised tax table, was substantively unreasonable. The defendant in *Vaughn* made just such an argument. *See* 433 F.3d at 923–25.

We therefore discern no reason for either a full remand to the district court for *de novo* resentencing or a limited remand to give the district court the opportunity to consider whether it would be inclined to sentence the defendants differently in light of *Peugh, cf. United States v. Paladino*, 401 F.3d 471, 483–84 (7th Cir. 2005). For all of the reasons we have discussed, the district court's use of the revised tax table was not contrary to the *ex post facto* clause of the Constitution and was fully consistent with our jurisprudence prior to *Demaree*, which *Peugh* abrogated. We therefore reinstate our prior decision as modified by this opinion and again AFFIRM the sentences imposed on defendants Vallone, Hopper, Dunn and Bartoli.