In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2996

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRUNO MANCARI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 248-01—**John F. Grady**, *Judge.*

ARGUED FEBRUARY 21, 2006—DECIDED SEPTEMBER 1, 2006

Before MANION, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Bruno Mancari was convicted by a jury of unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), and sentenced to 41 months in prison. Mancari appeals his conviction, contending that the district court erred by denying his motion for a hearing to challenge the search warrant that led to the discovery of the gun and by permitting the prosecution to introduce evidence regarding $6,500 in cash that was discovered in his house. Mancari also appeals his sentence, arguing that the district court failed to heed our post-*Booker* jurisprudence in its consideration of his request for a sentence below the advisory Sentencing Guidelines range. For the reasons set forth below, we affirm Mancari's

conviction but remand the case to the district court for resentencing.

# I

This fairly straightforward case has a rather involved backstory. In 1988, Mancari pleaded guilty to federal drug and mail fraud charges and served four years in prison. Between the time of his release and the events leading up to this case, he was not charged with any other crime. He was, however, a suspect in the unsolved 1985 murder of Joseph Russo, who just prior to his death had been served with a subpoena to testify in an investigation of an auto theft ring allegedly run by Mancari.

That case apparently remained cold for a number of years. Then, in 1995, an inmate at a Wisconsin state prison, Harold Merryfield, contacted authorities and implicated Mancari in Russo's murder, claiming that he had arranged for Mancari and another man to use Merryfield's mother's house in Burbank, Illinois, as a site for the murder and had later removed the body from the house. Merryfield also told investigators that he sometimes received mail (including small cash payments) and visits from Mancari in prison. The arrangement worked as follows: when Merryfield wished to contact Mancari, he would have his daughter Tammy contact Mancari using the phony name "Joanne." If Mancari wished to send a letter to Merryfield, he would use Tammy Merryfield's name and Merryfield's mother's old house as a return address. Despite having gathered this information from Merryfield, however, the police took no action against Mancari at the time.

The pace quickened in January 2001, after investigators from the Cook County Sheriff's Department questioned Peter Fisher, who Merryfield claimed had helped move Russo's body after the murder. Fisher generally corroborated Merryfield's version of events, and his statement

apparently spurred the authorities to pursue Mancari more seriously. Most importantly, police recruited Merryfield to cooperate against Mancari. Merryfield contacted his daughter and instructed her to call Mancari and ask him to visit Merryfield. In a recorded conversation at the prison in November 2001, Mancari and Merryfield discussed the Russo murder investigation and Mancari agreed to send Merryfield $5,000 for "legal fees" through the mail. Soon thereafter, a certified letter was intercepted at the prison addressed to Merryfield with Tammy Merryfield as the return addressee. Inside the envelope was a check for $5,000. Although the check itself did not identify the drawer, it was issued by a branch of First Midwest Bank located one-and-a-half miles from the auto dealership where Mancari was employed as a sales manager. Upon further investigation, authorities learned that the check was of a type designed as a multi-part form. The top part of the form consisted of the check itself, while the bottom two copies typically were retained by the drawer as receipts.

On the basis of this information, a Cook County Circuit Court judge issued a search warrant for Mancari's home to seize "official check receipts and any other money order receipts or bank withdrawal records from Bruno Mancari to Harold Merryfield" in connection with the investigation of Russo's murder. On January 8, 2002, police officers executed the search warrant. Although they did not find the financial records they sought, they discovered a loaded .38 caliber Derringer handgun in the drawer of a bedside nightstand and $6,520 in cash in a garment bag in the bedroom closet.

Soon after the search, Illinois authorities charged Mancari with Russo's murder. A jury acquitted him of the charge, however, after Fisher, who appeared as a state's witness, contradicted his earlier statement to police by testifying that he had witnessed Merryfield, not Mancari, kill Russo. In March 2004, a federal grand jury indicted

Mancari for unlawful possession of a firearm by a felon. After an initial trial, the jury deadlocked and a mistrial was declared. Federal prosecutors then tried Mancari a second time, this time obtaining a conviction. The district court sentenced Mancari to 41 months' imprisonment, the low end of the applicable Guidelines range, stating that although he would have liked to impose a lower sentence, he lacked authority to do so.

## II

### A

Mancari first contends that the district court erred by denying him a hearing to challenge the validity of the search warrant that led to the discovery of the gun in his bedroom. Such a hearing is required "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

Mancari takes issue with the clear error standard of review that this court has applied in reviewing a district court's denial of a motion for a *Franks* hearing. As he sees it, our approach is inconsistent with the Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690 (1996). While the immediate issue before the Court in *Ornelas* dealt with warrantless searches, *id.* at 691, the Court's ultimate holding about the standard of review for reasonable suspicion and probable cause determinations followed a discussion of both warrantless searches and those supported by a warrant, such as the one in *Illinois v. Gates,* 462 U.S. 213 (1983). Emphasizing that historical findings of fact, either in support of a warrant or in support of an action without a warrant, are entitled to deference, the

Court nonetheless concluded that "independent appellate review of these ultimate determinations of reasonable suspicion and probable cause" is necessary in order to permit appellate courts to apply consistent legal standards. 517 U.S. at 697.

A showing that a warrant was based on a false statement requires an examination of historical facts, not the eventual legal determination that any given set of facts add up to probable cause for the issuance of a warrant. For this reason, we have regularly reaffirmed our clear error standard of review since *Ornelas*. See *Zambrella v. United States*, 327 F.3d 634, 638 (7th Cir. 2003); *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001); *United States v. Roth,* 201 F.3d 888, 891 (7th Cir. 2000). The First Circuit has expressly rejected the argument Mancari presents. See *United States v. Owens,* 167 F.3d 739, 747 n.4 (1st Cir. 1999). We agree with that court, and thus we decline Mancari's invitation to adopt the *de novo* standard of review.

Turning to the merits of Mancari's claim, the affidavit submitted by Cook County Sheriff's Investigator Louis Schubrych in support of the warrant relied on the recorded jailhouse conversation between Mancari and Merryfield, the intercepted $5,000 check, and Merryfield's statements implicating Mancari in Russo's murder. Mancari urged the district court to find that he was entitled to a *Franks* hearing primarily because the police were aware of the fact that Merryfield was an extremely unreliable informant and had given inconsistent explanations for how the murder occurred. The district court rejected this argument, reasoning that "[e]ven taking Mancari's alleged omissions regarding criminal histories, drug use and inconsistent statements by Merryfield at face value, these omissions are not material. That is, inclusion of the information would not have undermined the showing of probable cause." The court emphasized that "[t]he affidavit did not need to establish,

as Mancari seems to argue, probable cause to believe that Mancari committed the murder," but rather only probable cause that bank receipts relating to Mancari and Merryfield would be found in the house.

In his brief before this court, Mancari again emphasizes Merryfield's inadequacies as an informant, failing for a second time to address the issue of the materiality of Merryfield's statements adequately. Mancari insists that without the context Merryfield's statements provided, the "financial documents or correspondence between Mancari and Merryfield simply would not constitute evidence of a crime, subject to law enforcement seizure." This argument is unpersuasive. Mancari was a suspect in Russo's murder long before Merryfield made his statements to the police. In addition, Merryfield's claim that both he and Mancari were involved in the Russo murder is strongly corroborated by the recorded jailhouse conversation and the surreptitiously mailed check. Even if Merryfield lied when he pegged the murder on Mancari and, as Mancari argues, Merryfield is the real murderer, the police still had probable cause to search for the bank receipts in Mancari's house as evidence of that crime. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

Since any false statements by Merryfield in the search warrant affidavit were not material to the judge's finding of probable cause, the district court did not err by denying Mancari's request for a *Franks* hearing.

**B**

Mancari next argues that the district court erred by permitting the government to introduce at trial testimony

about and photographs of the $6,500 discovered at his house, evidence he contends was seized in violation of the Fourth Amendment. We review the district court's evidentiary rulings for an abuse of discretion, *United States v. Heath*, 447 F.3d 535, 538 (7th Cir. 2006), and the court's legal conclusion that the photographing of the money did not constitute an unreasonable seizure *de novo*, see *United States v. Smith*, 423 F.3d 25, 31 n.4 (1st Cir. 2005).

Mancari's strategy at both his first trial and the retrial was to cast doubt on whether the police really discovered the gun at his residence, suggesting instead that they had planted it there. The government, in turn, sought to introduce testimony and photographs concerning the discovery of the money at Mancari's house in order to show that Mancari had a motive to possess the gun for self-protection. The government did not contend that Mancari's possession of the money was evidence of some further illegality; it seemed to accept Mancari's explanation that the possession of such an amount of cash was routine for the manager of an auto dealership.

During Mancari's first trial, the district court refused to allow the government to introduce a picture of Mancari's bedroom that included the pile of cash, apparently agreeing with Mancari that this evidence was too prejudicial and commenting that "[i]t raises the possibility that some juror is going to wonder, hey, was he up to no good with all that money?" At the second trial, however, Mancari's lawyer opened the door to discussion of the $6,500 by referring in his opening statement to the discovery of the money while setting forth his argument that police acted improperly in executing the search warrant. At a sidebar after opening statements were complete, the prosecutor said to the judge, "I guess they are withdrawing their objection with respect to us putting in photos of the money." Mancari's counsel responded that Mancari was withdrawing his relevancy objection, but continued to object to the admission of the

photos on "search and seizure grounds," that is, that "the search warrant didn't authorize [the police] to seize the money" or "to take a picture of the money." After overruling this objection, the district court allowed police officers to testify regarding their discovery of the $6,500 and for photographs of the money to be shown to the jury. The court cautioned the jury, however, that "there is absolutely no suggestion here that there is anything illegal about that money or that it had been derived in an illegal manner." During closing arguments, the government suggested that the $6,500 provided a motive for Mancari's possession of the gun, stating that: "He's got a lot of money in the house. You bet he's going to have a loaded gun. He is protecting what's in his house."

Although his argument on this point is not entirely clear, we do not understand Mancari to be challenging the introduction of testimony and photographs of the money on relevancy grounds, a challenge that he appears to have waived and that would in any case not be likely to succeed. See *United States v. Caldwell*, 423 F.3d 754, 759 (7th Cir. 2005) (in a felon-in-possession case, "any evidence that tended to make [ ] possession of the guns more or less probable was relevant"). Instead, he contends only that the district court erred in allowing the government to make use of this evidence because the money was outside the scope of the search warrant and therefore illegally seized. The government responds that the garment bag fell within the scope of the warrant, since it could have contained the financial records that were the object of the search. Once the money was in plain view, the government argues, the officers were entitled to photograph it. The government also points out that Mancari's lawyers repeatedly raised the issue of the $6,500 before the jury themselves. For example, they cross-examined a state's witness about the money in an attempt to impeach the execution of the search warrant and even published a photograph of the money during this cross-examination.

As the Supreme Court explained in *United States v. Ross*, 456 U.S. 798 (1982):

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.

*Id.* at 820-21. The government is correct that the search warrant in this case, which authorized police to search Mancari's house for financial records, easily encompassed the search of his bedroom closet and the garment bag. The fact that the money was not an object of the search warrant does not prohibit the police officers' testimony about their inadvertent discovery, since "[w]hen officers who are lawfully on the premises pursuant to a valid search warrant merely record what they observe there that is in plain view, they do not invade legally protected privacy or any other legal interest." *Platteville Area Apartment Assoc. v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999) (internal citations omitted).

Nor did the photographing of the money by police constitute an unreasonable seizure. Analogizing to *Arizona v. Hicks*, 480 U.S. 321 (1987), the district court concluded that by snapping a picture of a pile of cash that was in plain view, the police did not "meaningfully interfere" with Mancari's "possessory interest" any more than did the officer who recorded the serial number of Mr. Hicks's stereo. See *id.* at 324. At least one other circuit, employing the same reasoning as the district court, has also concluded that "the recording of visual images of a scene by means of photography does not amount to a seizure because it does not 'meaningfully interfere' with any possessory interest."

*Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992) (quoting *Hicks*, 480 U.S. at 324). This analysis seems sound to us. The government was therefore entitled to make a photographic record of the discovery of the money in a place that the police were lawfully entitled to observe.

## III

Finally, Mancari challenges the district court's sentencing decision, contending that the court failed to apprehend the full extent of its discretion to decide on a reasonable sentence in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and our decisions interpreting that case.

The district court accepted the Pre-Sentencing Report's calculation of the appropriate Guidelines sentencing range as 41-51 months. Mancari did not dispute this calculation, but argued for a below-Guidelines sentence based on what he characterized as the overrepresentation of his criminal history. In particular, Mancari argued that his previous convictions had occurred 14 years earlier and that, in the interim, he had not engaged in any criminal conduct and had worked hard to support his family. He also pointed out that under even the government's theory of the case he possessed a gun only for self-protection, not for any criminal purpose. Finally, Mancari urged the district court to take into account the fact that he had already served 16 months in jail on the state murder charge of which he had been acquitted and that he would almost certainly be deported to Italy—where he had not lived since he was a young child—upon his release from prison.

The district court appears to have been significantly persuaded by Mancari's arguments for lenience. The judge said that he was "imposing the lowest sentence I can and I would impose a lower one if I could." Nevertheless, after citing the language of Guideline § 4A1.3(b)(1) regarding

downward departures and *United States v. Bradford*, 78 F.3d 1216 (7th Cir. 1996), a pre-*Booker* case on the same subject, he concluded that, "I can't depart on the basis of an overstated criminal history," explaining that "[t]his is a case where I don't think I have the authority." Mancari argues that these statements demonstrate that the district court misunderstood its discretion post-*Booker* and show that if it had grasped the full extent of its power, it would have sentenced him below the advisory Guidelines range. The government disagrees, pointing to other statements by the district court, such as its acknowledgment that the Guidelines are only one of the factors it is supposed to consider in determining a sentence post-*Booker*, that may indicate that it was aware of its discretion, but simply declined to exercise it.

Having reviewed the sentencing transcript in its entirety, it is unclear to us whether the district court properly took its post-*Booker* discretion into account. Prior to *Booker*, the ability of a district court to grant a downward departure was limited by the Sentencing Guidelines. A court was permitted to depart from the applicable range only if it found "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *United States v. Sherman*, 53 F.3d 782, 788-89 (7th Cir. 1995) (quoting 18 U.S.C. § 3553(b)). In contrast, after *Booker*, "the concept of a discretionary departure . . . has been rendered obsolete." *United States v. Vaughn*, 433 F.3d 917, 923-24 (7th Cir. 2006). "Instead, what is at stake is the reasonableness of the sentence, not the correctness of the departures as measured against pre-*Booker* decisions that cabined the discretion of sentencing courts to depart from guidelines that were then mandatory." *Id.* (quotation marks omitted).

To reiterate our by-now familiar formulation, since *Booker* "the district court is required to calculate properly the

advisory sentencing range and to impose a sentence which takes into consideration the sentencing factors specified in 18 U.S.C. § 3553." *United States v. Baker*, 445 F.3d 987, 991 (7th Cir. 2006). If the sentence falls within the advisory sentencing range recommended by the Guidelines, it "is entitled to a rebuttable presumption of reasonableness." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). If, on the other hand, the district court wishes to depart from the advisory Guidelines, it may do so, but it must offer adequate justification for that departure. "The farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005).

Because Mancari's sentencing hearing took place relatively soon after *Booker*, the district court did not have the benefit of our decision in *Vaughn* and similar cases. As a result, it appears to have been under the misimpression that its discretion was still cabined by the pre-*Booker* departure jurisprudence. We think it likely enough from the court's comments that it might be inclined to issue a different sentence in light of *Booker* that a full remand is the proper course of action; there is no need for the court to repeat what it has already said in response to a limited remand. See *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005) ("[W]henever a district judge is required to make a discretionary ruling that is subject to appellate review, we have to satisfy ourselves, before we can conclude that the judge did not abuse his discretion, that he exercised his discretion, that is, that he considered the factors relevant to that exercise."); *United States v. Spano*, 447 F.3d 517, 519 (7th Cir. 2006) ("A refusal or failure to exercise the discretion afforded by *Booker* (or our inability to determine whether discretion was actually

exercised) would require a [ ] remand."). We therefore vacate Mancari's sentence and remand in order to give the district court an opportunity to exercise its discretion fully to determine a reasonable sentence in this case.

## IV

Accordingly, we AFFIRM Mancari's conviction, but we VACATE his sentence and REMAND to the district court for further proceedings consistent with this opinion.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*